# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| STEPHAN R. ORSAK, | Civil No. 08-5274 (JRT/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| METROPOLITAN AIRPORTS COMMISSION AIRPORT POLICE DEPARTMENT and OFFICER BRAD WINGATE, | |
| Defendants. | |

Philip W. Getts, **LAW OFFICES OF PHILIP W. GETTS**, 2116 Second Avenue South, Minneapolis, MN 55404, for plaintiff.

Timothy R. Schupp and Wendy M. Canaday, **FLYNN, GASKINS & BENNETT, L.L.P.**, 333 South Seventh Street, Suite 2900, Minneapolis, MN 55402, for defendants.

Plaintiff Stephan R. Orsak was bicycling on the road leading away from the Lindbergh Terminal of the Minneapolis-St. Paul International Airport when Officer Brad Wingate stopped him. Officer Wingate eventually ordered another officer to deploy a taser against Orsak. Orsak alleges that Officer Wingate, in so doing, used excessive force in violation of Orsak's Fourth Amendment right to be free from unreasonable seizures. Officer Wingate and the Metropolitan Airports Commission (collectively, "defendants"), filed a motion for summary judgment on all counts. (Docket No. 14.) For the reasons stated below, the Court grants the motion in part and denies the motion in part.

At approximately 6:00 pm on September 7, 2006, Stephan Orsak arrived by airplane at the Lindbergh Terminal of the Minneapolis-St. Paul International Airport, retrieved his folding bicycle from the baggage claim area, unfolded it, exited the terminal building, and began to pedal away from the airport along Glumack Drive, as indicated in the following map.  (Orsak Aff. ¶¶ 1-2, Docket No. 25; *id.* Ex. 1.)



---

[1] The Court views the facts and evidence in the record in the light most favorable to Orsak, the non-moving party.  *Riley v. Lance*, 518 F.3d 996, 999 (8th Cir. 2008).

- 2 -

Orsak intended to travel to a location on Glumack Drive where he could gain access to Northwest Drive, a service road that runs parallel to Glumack Drive for several hundred feet and then veers off to the right, to intersect with Post Road. (*Id.* ¶ 3.) He intended to follow Northwest Drive and Post Road to the bicycle path system in Fort Snelling State Park, and then to ride to his daughter's house in St. Paul. (*Id.*)

At the time Orsak was riding along Glumack Drive, Officer Orlando Bryant was driving with Officer Brad Wingate in a squad car along the same route. (Joint Ans. of Defs. ¶ 4, Docket No. 3; Trial Tr., *State v. Orsak*, July 17, 2007, at 35, Schupp Aff. Ex. A, Docket No. 16.) They were driving to the airport's Humphrey Terminal to assist in locating a runaway youth. (*See* Orsak Aff. ¶ 31, Docket No. 25.) Officers Wingate and Bryant observed Orsak bicycling close to the curb and pulled their squad car alongside him. (Joint Ans. ¶ 4, Docket No. 3; Orsak Aff. ¶¶ 5, 7, Docket No. 25.) At the time of the initial contact, Orsak had traveled approximately 1500 feet from the Lindbergh Terminal. (Orsak Aff. ¶ 5, Docket No. 25; *id.* Ex. 1.)

Officer Wingate testified that due to the heavy motorized vehicle traffic, he was concerned for Orsak's safety and for the safety of motorists traveling along the same road. (Trial Tr. at 40, Schupp. Aff. Ex. A, Docket No. 16.) Officer Wingate rolled down his window and said something that Orsak did not hear clearly, and then Officer Wingate stated, "Get off the road – you can't ride a bicycle there . . . you're blocking traffic." (Orsak Aff. ¶¶ 5-6, Docket No. 25; Joint Ans. ¶ 4, Docket No. 3.) Officer Wingate testified that at this time he did not intend to stop the squad car or issue a citation, but simply hoped that Orsak would move over to Northwest Drive, the less-traveled service

road running parallel to Glumack Drive.  (Trial Tr. at 43, 46, Schupp. Aff. Ex. A, Docket No. 16.)

After hearing Officer Wingate's command to get off the road, Orsak stopped pedaling and coasted to a stop at a location approximately 600 feet from Orsak's initial contact with the squad car.  (Orsak Aff. ¶ 7, Docket No. 25; *id.* Ex. 1.)  Orsak stopped on the side of the road, and as Orsak was coming to a stop, Officer Wingate asked him why he did not pull off at a previous ramp.  (*Id.* ¶¶ 7-8.)  Orsak explained that the ramp was a one-way ramp for vehicles to enter Glumack Drive.  (*Id.* ¶ 8.)  Although defendants contend that Orsak cursed and was angry, (Joint Ans. ¶ 5, Docket No. 3), Orsak asserts that at all times during the conversation, he attempted to speak civilly and calmly.  (Orsak Aff. ¶ 35, Docket No. 25.)  The squad car stopped a short distance ahead of Orsak, and Officer Wingate stepped out.  (*Id.* ¶ 9.)

Orsak contends that when Officer Wingate exited the squad car his demeanor appeared "instantly aggressive and confrontational."  (Trial Tr. at 205, Schupp Aff. Ex. A, Docket No. 16.)  Officer Wingate yelled, "Get up on the curb or you will be tased or maced."  (Orsak Aff. ¶ 9, Docket No. 25.)  Orsak responded by pulling his bicycle onto the concrete median between Glumack Drive and Northwest Drive.  (*Id.* ¶ 10.)  As he did so, he asked, "What's going on here?  Why are you treating me like this?"  (*Id.*)  Officer Wingate responded by stating that "[b]icycles are not allowed on [Glumack Drive]."  (*Id.* ¶ 11.)

Orsak indicated that Officer Wingate's statement surprised him, because Orsak had ridden his bicycle along that route on several other occasions without incident, and

he had not seen any signs at the Lindbergh Terminal or along Glumack Drive indicating that bicycles were prohibited there.  (*Id.* ¶ 12.)  Orsak asked Officer Wingate whether there was a sign posted to state that bicycle traffic was prohibited, and in response Officer Wingate gestured vaguely toward the terminal and stated, "Back there."  (*Id.* ¶¶ 12-13.)  In fact, there were no signs along Glumack Drive stating that bicycles were prohibited.  (Joint Ans. ¶ 17, Docket No. 3.)  Orsak asked Officer Wingate for the specific location of the sign, and, according to Orsak, Officer Wingate responded with an angry tone of voice, stating, "Look, I'm telling you, you can't ride your bike here."  (Orsak Aff. ¶ 15, Docket No. 25.)  Orsak then complained about Officer Wingate's tone of voice, stated that he thought Officer Wingate was being rude, read Officer Wingate's name aloud from his uniform, and requested to speak with Officer Wingate's supervisor.  (*Id.* ¶¶ 16-17.)  Officer Wingate began to speak more civilly, and asked Orsak what route he intended to follow.  (*Id.* ¶ 18.)

After Orsak explained his intended route, Officer Wingate responded, "Well, I see you've done your homework.  Just this once I'll let you ride out along here (indicating Northwest Drive) and pick up Post Road."  (*Id.* ¶ 20.)  Orsak responded, "That's fine, but what do I do the next time I come to the airport?  I don't want to go through this again."  (*Id.* ¶ 21.)  Orsak contends that Officer Wingate responded in a belligerent tone, stating, "No!  You're going to **walk** your bike to Post Road."  (*Id.* ¶ 22.)

Orsak then complained to Officer Wingate about the two contradictory instructions Officer Wingate had given.  (*Id.* ¶ 23.)  Orsak explained that even though the

initial portion of Northwest Drive was one-way in the opposite direction, it had a suitable narrow lane in which he could ride against oncoming traffic. (*Id.*)

Officer Wingate then gave Orsak a third instruction, stating, "No! You're going to walk your bike back to the terminal and take public transportation." (*Id.* ¶ 24.) Orsak responded that this was a "ridiculous suggestion" because it would be dangerous for Orsak to walk with his bicycle against traffic along a busy road with no sidewalks and with high concrete curbs. (*Id.* ¶ 26.) At about this time, Officer Bryant joined Officer Wingate and Orsak on the median. (*Id.* ¶ 28.)

Officer Wingate then directed Orsak to "[g]et down on [his] knees." (*Id.* ¶ 27.) Orsak told the officers that he was "dumbfounded by this order" because he had not posed any threat to them. (*Id.* ¶ 28.) Orsak contends that he repeatedly told the officers that he "would abide by whatever laws applied, but that [he] did not understand why [he] was being treated like a suspected felon or what [he] had done wrong." (*Id.* ¶ 29.) Officer Wingate did not repeat the order for Orsak to get on his knees but instead told Orsak that he and Officer Bryant had been on their way to the Humphrey Terminal to help look for a runaway youth and that Orsak was wasting their time. (*Id.* ¶ 31.) Orsak agreed that the encounter was a waste of time and offered to follow Officer Wingate's first suggestion and ride his bicycle along Northwest Drive to Post Road, as Orsak had originally intended. (*Id.* ¶¶ 32-33.) Orsak stated, "The best thing is I simply go along this service road and you get to your stop." (Trial Tr. at 215, Schupp Aff. Ex. A, Docket No. 16.) Orsak contends, contrary to the officers' allegations, that the officers voiced no objection, and Orsak mounted his bicycle. (Orsak Aff. ¶ 34, Docket No. 25; *see* Joint

Ans. ¶ 7, Docket No. 3.)  As Orsak placed his feet on the pedals, he told the officers, without animus or hostility, "I'm going to wish you both a good evening and hope the rest of it goes better than this has gone."  (Trial Tr. at 215, Schupp Aff. Ex. A, Docket No. 16.)  Defendants allege that Officer Wingate ordered Orsak to stop multiple times, but Orsak denies that they issued any such orders at the time Orsak initiated his departure.  (Joint Ans. ¶ 7, Docket No. 3.)

As Orsak began pedaling and after he had traveled no more than three feet, Officer Wingate grabbed Orsak by one shoulder and by his backpack, pulled him off the bicycle, spun him around, and threw him to the ground.  (Orsak Aff. ¶ 37, Docket No. 25.) Orsak's glasses flew off, he fell forward, and his face hit the concrete median.  (*Id.* ¶¶ 38-39.)  Defendants deny that Officer Wingate threw Orsak to the ground.  (Joint Ans. ¶ 7, Docket No. 3.)  Orsak contends that as a result of the impact, his helmet cracked and he suffered abrasions on his face and left arm.  (Orsak Aff. ¶¶ 38-39, Docket No. 25.) According to Orsak, Officer Wingate then grabbed Orsak under his arms and attempted to pull him up into a standing position.  (*Id.* ¶ 40.)  As Officer Wingate began to do so, Orsak was disoriented and attempted to regain his balance, but Orsak contends that he did not attempt to struggle or strike Officer Wingate.  (*Id.* ¶ 41.)  Defendants allege that Orsak resisted Officer Wingate's attempts to get Orsak under control and that Orsak advanced aggressively at Officer Wingate.  (Joint Ans. ¶ 7, Docket No. 7.)

According to Orsak, after Officer Wingate lifted Orsak to a semi-standing position, he released Orsak, stepped away, and told Officer Bryant to "Shoot him!" (Orsak Aff. ¶ 42, Docket No. 25.)  Officer Bryant then shouted "Taser, taser, taser" and

fired a taser[2] at Orsak. (*Id.* ¶ 43.) The taser darts struck Orsak in his right chest and hip. (*Id.* ¶ 44.) Orsak testified that the pain from the taser was "excruciating." (Trial Tr. at 225, Schupp Aff. Ex. A, Docket No. 16.) The taser completely incapacitated Orsak, who collapsed to the ground, suffering additional scrapes and bruises. (Orsak Aff. ¶¶ 44-45, Docket No. 25.)

After Orsak fell to the ground, he did not resist at all. (Trial Tr. at 225, Schupp Aff. Ex. A, Docket No. 16.) According to Orsak, Officer Wingate walked over to Orsak's glasses and smashed them with his boot, and then handcuffed Orsak. (Orsak Aff. ¶¶ 46-47, Docket No. 25.) Orsak was ultimately arrested and taken by ambulance to Hennepin County Medical Center, where his injuries were examined and treated. (*Id.* ¶¶ 54-56.)

Orsak was charged with several misdemeanor offenses, including obstruction of legal process, failure to comply with a lawful order of a police officer, riding a bicycle opposite adjacent vehicle traffic, failure to obey an official traffic control signal, and failure to travel in the correct direction on a one-way roadway. (*Id.* ¶ 57.) A jury trial took place in July 2007, and Orsak was acquitted on all counts except for failure to comply with a lawful order. (*Id.* ¶ 59.) The Minnesota Court of Appeals affirmed his conviction on September 16, 2008. *State v. Orsak*, No. A07-1530, 2008 WL 4224503, at *1-2 (Minn. Ct. App. Sept. 16, 2008). Orsak paid a fine of $300 and completed eight

---

[2] The trade name "taser" "is an acronym for 'Thomas A. Swift's Electric Rifle,'" featured in <u>Tom Swift and His Electric Rifle, or, Daring Adventures in Elephant Land</u>, by Victor Appleton (1911). *Gosserand v. Parish of Jefferson*, No. 05-5005, 2006 WL 3247113, at *1 n.1 (E.D. La. Nov. 7, 2006). The inventor "named the gun for the science-fiction teenage inventor and adventurer character, Tom Swift." *Id.*

hours of community service, and after one year the remaining twenty-seven days of his sentence were discharged. (*Id.* ¶¶ 60-61.)

On September 5, 2008, Orsak filed a civil complaint in Hennepin County District Court. (Complaint, Notice of Removal Ex. A, Docket No. 1.) Orsak's *pro se* complaint alleges violations of Orsak's civil rights and seeks damages under 42 U.S.C. § 1983. (*Id.* at 1.) On September 25, 2008, defendants timely filed a notice of removal in accordance with 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331. (Notice of Removal, Docket No. 1.) On June 26, 2009, defendants filed a motion for summary judgment on all claims.[3]

## ANALYSIS

## I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to

---

[3] The Court has dismissed all claims as to two other officers, (Docket Nos. 12, 33), and Orsak agrees that summary judgment in favor of defendants is proper as to all claims other than the excessive force claim. (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. at 1-2, Docket No. 24.) At oral argument on defendants' motion, Orsak's counsel informed the Court that Orsak is no longer seeking injunctive relief and confirmed that he is not pursuing a *Monell* claim against the Metropolitan Airports Commission. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). The Court therefore grants summary judgment in favor of the defendants on those claims relating to the other officers and the Metropolitan Airports Commission. *See Mann v. Yarnell*, 497 F.3d 822, 828 (8th Cir. 2007) (municipality may not be held liable based on *respondeat superior*).

Defendants note that the Airport Police Department is a subdivision of the Metropolitan Airports Commission, rather than a separate entity. (Mem. in Supp. of Defs.' Mot. for Summ. J. at 7 n.1, Docket No. 15.) The Court concludes that the Metropolitan Airports Commission is the proper defendant.

return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.     ORSAK'S EXCESSIVE FORCE CLAIM

Defendants argue that summary judgment is appropriate because Officer Wingate did not violate Orsak's Fourth Amendment rights and because Officer Wingate is entitled to qualified immunity.[4]  The two arguments are intertwined.  In analyzing whether Officer Wingate is entitled to qualified immunity, the Court "consider[s] two questions: (1) whether the facts that [Orsak] has alleged or shown, when viewed in the light most favorable to" Orsak, support a finding that Officer Wingate's conduct "violated a

---

[4] Defendants also argue that Orsak's § 1983 suit is an impermissible attack on Orsak's criminal conviction for failure to comply with a lawful order. (Mem. in Supp. of Defs.' Mot. for Summ. J. at 8-10, Docket No. 15.)  *Heck v. Humphrey* prohibits a plaintiff from bringing a civil action for damages that necessarily challenges the validity of plaintiff's previous conviction. 512 U.S. 477, 486-87 (1994).  The Court noted that if "the plaintiff's action, even if successful, will **not** demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit." *Id.* at 487.

*Heck* does not apply here because Orsak's excessive force claim would not necessarily demonstrate the invalidity of his criminal conviction.  In affirming Orsak's conviction, the Minnesota Court of Appeals observed that the jury heard evidence of several orders Officer Wingate allegedly gave Orsak.  The court concluded that "the jury could have convicted [Orsak] of failing to comply with a lawful order based on his refusal to comply with the initial police order" directing Orsak "to move his bicycle from" Glumack Drive. *Orsak*, 2008 WL 4224503, at *1-2.  A successful excessive force claim would not challenge the legality of this initial order or a possible jury finding that Orsak failed to comply with that order.  Hence, *Heck* does not bar Orsak's suit. *See Madison v. City of Minneapolis*, No. 02-4257, 2004 WL 1630953, at *4 (D. Minn. July 15, 2004) ("Several courts have noted . . . that a valid arrest does not necessarily preclude a claim for use of excessive force.").

constitutional right, and (2) whether that constitutional right was 'clearly established' [at the time of the conduct] such that a reasonable official would have known that his or her actions were unlawful."[5] *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009) (some internal quotation marks omitted). "Unless the answer to both of these questions is yes, the defendants are entitled to qualified immunity." *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009).

### A. A Reasonable Jury Could Find That Officer Wingate's Conduct Violated Orsak's Constitutional Right to Be Free from Excessive Force.

Orsak's § 1983 claim alleges that Officer Wingate violated Orsak's Fourth Amendment right to be free from excessive force. "To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Cook v. City of Bella Villa*, 582 F.3d 840, 848-49 (8th Cir. 2009) (internal quotation marks and brackets omitted). "Excessive force claims arise under the Fourth Amendment." *Smith v. Kan. City, Mo. Police Dep't*, 586 F.3d 576, ___, 2009 WL 3713701, at *3 (8th Cir. Nov. 9, 2009). "Not every push or shove . . . violates the Fourth Amendment, but force is excessive when the officers' actions are not objectively reasonable in light of the facts and circumstances confronting them." *Rohrbough v. Hall*, 586 F.3d 582, ___, 2009 WL 3713703, at *2 (8th Cir. Nov. 9, 2009) (internal quotation marks omitted; alteration in original).

---

[5] Courts are no longer required to follow the rigid two-step sequence articulated in *Saucier v. Katz*, 533 U.S. 194, 200 (2001). *See Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). The Court nonetheless concludes that the "*Saucier* protocol" is most appropriate for the facts and circumstances of this case, and therefore follows it here. *See id.*

### 1.     Objective Reasonableness

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 989 (8th Cir. 2009) (internal quotation marks omitted).  Courts consider the totality of the circumstances to assess the reasonableness of the officer's conduct, and the Supreme Court in *Graham v. Connor* identified three factors that are relevant to that assessment: "[(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight." *Rohrbough*, 586 F.3d at ___, 2009 WL 3713703, at *2 (internal quotation marks omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)); *see also Smith*, 586 F.3d at ___, 2009 WL 3713701, at *3.  The Court does not evaluate reasonableness "with the 20/20 vision of hindsight.  This calculus allows for the fact that police officers are often forced to make split-second decisions – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (citations and internal quotation marks omitted).

As an initial matter, the Court notes that, viewing the facts in the light most favorable to Orsak, the circumstances surrounding Officer Wingate's use of force were not the type of "tense, uncertain, [or] rapidly evolving" circumstances calling for "split-second decisions" about the amount of force necessary to subdue or restrain a suspect.

*See Brown*, 574 F.3d at 496 (internal quotation marks omitted). Moreover, there are genuine issues of material fact regarding the objective reasonableness of Officer Wingate's conduct, such that a reasonable jury could conclude that Officer Wingate's use of force was not objectively reasonable.

First, Orsak's crime or crimes were neither serious nor violent. Orsak had not committed a crime by riding on Glumack Drive. Even though Officer Wingate allegedly believed that bicycles were "pedestrians" and therefore were prohibited from the area, (Joint Ans. ¶ 17, Docket No. 3; *see also* Trial Tr. at 77, Schupp Aff. Ex. A, Docket No. 16), a reasonable officer under the circumstances would have concluded that Orsak was complying with the law in riding his bicycle alongside the curb of Glumack Drive. *See* Minn. Stat. § 169.222 subd. 1 ("Every person operating a bicycle shall have all of the rights and duties applicable to the driver of any other vehicle[.]"); *id.* subd. 4(a) ("Every person operating a bicycle upon a roadway shall ride as close as practicable to the right-hand curb or edge of the roadway[.]"); *see also Orsak*, 2008 WL 4224503, at *2 ("[P]olice may issue a 'lawful order' under [Minn. Stat. § 169.02] for safety reasons without a reasonable suspicion that a separate crime has been committed. Thus, the police had discretion to issue orders to maintain safety and the free flow of traffic on the heavily traveled airport road, and appellant's presence on a bicycle was sufficient to justify the order to move his bicycle." (citation omitted)). A reasonable officer under the circumstances would have concluded that Orsak was slow to respond to Officer Wingate's lawful command to get off of the road, and that Orsak was somewhat argumentative but civil in his efforts to ascertain the applicable laws governing his travel

by bicycle. But viewing the facts in the light most favorable to Orsak, a reasonable officer would conclude that Orsak's most serious crime, if any, was refusing to comply with a series of contradictory lawful orders regarding where and how Orsak should depart the airport premises. There is a disputed issue of material fact as to whether, when Orsak informed the officers of his intent to ride away, the officers objected or ordered Orsak to stop. Viewing the facts in the light most favorable to Orsak, the officers' conduct suggests that under the circumstances Orsak's offenses were potentially insignificant and that a reasonable officer under the circumstances likely would not have even issued a citation.

Second, there is a genuine issue of material fact as to whether Orsak posed an immediate threat to the officers or anyone else at the time Officer Wingate ordered Officer Bryant to fire the taser. Throughout a relatively prolonged conversation, Orsak had not physically or verbally threatened the officers. He was outnumbered by the officers, who had a squad car at their disposal, while Orsak was traveling on a foldable bicycle and wearing a backpack. The incident took place in broad daylight alongside a busy road. Orsak announced his intent to depart and informed the officers of his intended route. Viewing the facts in the light most favorable to Orsak, the Court finds that Orsak's conduct was not threatening. According to Orsak, after Officer Wingate threw Orsak to the ground, Orsak did not resist or otherwise pose any immediate threat to the officers. Indeed, Officer Wingate did not direct Orsak to remain on the ground or attempt to handcuff him, providing further objective evidence that Orsak did not pose any threat. Then, when Officer Wingate attempted to raise Orsak to a standing position, Orsak

attempted to regain his balance. Although Officer Wingate disputes Orsak's version of events, the Court must conclude for purposes of summary judgment that Orsak did not struggle with Officer Wingate or attempt to strike him. Consistent with the Court's conclusion, counsel for defendants conceded at oral argument that Orsak was probably not a threat to anyone's safety at the time of the incident.

Third, there is a genuine issue of material fact as to whether Orsak was actively resisting arrest or attempting to evade arrest by flight. According to Orsak's version of events, at the time Orsak began to pedal away, there was no "arrest" for Orsak to resist or attempt to evade. The fact that Orsak announced his intent to depart and wished the officers a good evening provides objective evidence that Orsak was not resisting or attempting to evade arrest. There is a genuine issue of material fact as to whether Orsak resisted or appeared to be resisting when he hit the ground and when Officer Wingate attempted to pull him into a standing position. At the time Officer Wingate ordered Officer Bryant to deploy the taser, nobody had told Orsak that he was under arrest, that he should remain on the ground, or that the officers intended to handcuff him. At most, viewing the facts in the light most favorable to Orsak, a reasonable officer would have perceived Orsak's attempts to regain his balance as passive, rather than active, resistance.

In summary, the *Graham* factors demonstrate that where a suspect has committed such a minor crime that a reasonable officer would not even issue a citation, and where the suspect poses only a remote and theoretical threat to officer safety, and where the officers have not attempted to handcuff the suspect or otherwise execute an arrest, it is objectively unreasonable to deploy a taser to subdue the suspect. *Cf. Cook*, 582 F.3d at

589 (Shepherd, J., concurring in part and dissenting in part) ("'[A] reasonable officer would not discharge his Taser simply because of insolence.'" (quoting *Parker v. Gerrish*, 547 F.3d 1, 10 (1st Cir. 2008))); *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007) (concluding that none of the *Graham* factors supported the deployment of a taser and noting that "[t]he absence of any warning – or of facts making clear that no warning was necessary – makes the circumstances of this case especially troubling," because the officer gave the plaintiff "no opportunity to comply with her wishes before firing her Taser"); *Michaels v. City of Vermillion*, 539 F. Supp. 2d 975, 990 (N.D. Ohio 2008) ("[T]he use of a taser . . . , although nonlethal, may be excessive if it is gratuitous."). There are genuine issues of material fact as to each of the *Graham* factors, and, viewing the disputed facts in the light most favorable to Orsak, Officer Wingate's conduct is not objectively reasonable as a matter of law. A reasonable jury could conclude that Officer Wingate's order to deploy the taser was not reasonable in light of the severity of Orsak's crimes, the threat posed by Orsak, and Orsak's lack of active resistance or flight.

The Court's conclusion is consistent with two recent Eighth Circuit cases involving the use of a taser on automobile passengers. In *Brown v. City of Golden Valley*, the Eighth Circuit concluded that there was "a genuine issue of material fact as to whether [the officer] used excessive force in violation of [the passenger's] constitutional rights." 574 F.3d at 498. The officer used a taser in "drive stun mode" on a frightened passenger's arm for approximately two or three seconds after she twice refused the officer's order to terminate her cell phone call to 911 while her husband was being

arrested. *Id.* at 495. In applying the *Graham* factors, the Eighth Circuit noted that the passenger was alleged to have committed a minor, nonviolent crime (Minnesota's open bottle law), that she did not physically or verbally threaten the officers, and that she "was not actively resisting arrest or attempting to flee," even though she did "scoot[] away from the door and pull[] her knees towards her chest" when the officer opened her car door. *Id.* at 495-97.

The Eighth Circuit found that the circumstances in *Brown* were substantially different from those in *Lawyer v. City of Council Bluffs*, in which the Eighth Circuit concluded that even though the first and third *Graham* factors did not support the use of force, the second factor alone was sufficient to warrant the use of pepper spray because the officer objectively believed he was in immediate physical danger. *Id.* at 497-98 (citing *Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1101-02, 1105 (8th Cir. 2004)). In *Lawyer*, the driver failed to respond to numerous orders to exit the vehicle and to unlock the doors, and then began to roll up the window while the officer's arm was inside the vehicle. 361 F.3d at 1101-02. The Eighth Circuit concluded that it was objectively reasonable for the officer to fear that he could be dragged down the road with his arm trapped in the window if the vehicle began to move. *Id.* at 1105. The *Brown* court observed that "[t]he suspect in *Lawyer* posed an immediate threat to the officer's safety, and the circumstances were tense, uncertain, and rapidly evolving." 574 F.3d at 498 (internal quotation marks omitted). As in *Brown*, "the same cannot be said in this case." *Id.*

In *Cook v. City of Bella Villa*, the Eighth Circuit held that an officer's deployment of a taser against a passenger was "objectively reasonable as a matter of law" where the officer was "alone and outnumbered by presumably intoxicated suspects," the driver had made sarcastic comments and refused to submit to a breathalyzer test, and the passenger demonstrated "wayward behavior in exiting the vehicle and opposing [the] arrest and/or search" of the driver. 582 F.3d at 849. The court concluded that under the circumstances the officer had a "legitimate reason" to deploy the taser, noting that the officer was "alone, on a state highway, at midnight, . . . arresting an uncooperative driver [while two passengers] were hysterically shouting at [the officer] . . . . [when the plaintiff] stepped out of the vehicle, and took a step toward" the officer. *Id.* at 850.

The circumstances of *Cook* are far removed from those presented in this case. In *Cook*, officer safety was the dispositive factor justifying the use of force. The officer was alone and outnumbered by several presumably intoxicated suspects, and the plaintiff had just exited the car to challenge the officer's arrest of the driver. The encounter took place at midnight beside a state highway. Under such circumstances, a reasonable officer could conclude, as in *Lawyer*, that there was an immediate threat to his safety and that the use of force was warranted. Such circumstances, however, were not present when Officer Wingate directed Officer Bryant to deploy the taser against Orsak, according to Orsak's version of events.

### 2. The Extent of Orsak's Injuries

The Eighth Circuit requires the existence of an "actual injury" in order to support an excessive force claim under the Fourth Amendment. *Hanig v. Lee*, 415 F.3d 822, 824

(8th Cir. 2005). Other courts have recognized that the pain and injuries suffered from being shot with a taser gun are "actual harms." *Zivojinovich v. Barner*, 525 F.3d 1059, 1070 (11th Cir. 2008).

Defendants do not dispute that Orsak suffered actual injury, but instead argue that Orsak's "excessive force claim fails because [Orsak] suffered only minor bruises and abrasions from the incident." (Mem. in Supp. of Defs.' Mot. for Summ. J. at 14, Docket No. 15.) They assert that "[t]he Eighth Circuit has held that a de minimis injury cannot sustain an excessive force claim." (Defs.' Reply in Supp. of Mot. for Summ. J. at 5, Docket No. 28.) But as the Eighth Circuit recently reiterated in *Cook*, "[i]t remains an open question in this circuit whether an excessive force claim requires some minimum level of injury." 582 F.3d at 850 (citation and internal quotation marks omitted). For the reasons stated below, it is not necessary for the Court to resolve that question here.

The pain and injuries associated with tasers are different in nature and quality from the types of injuries the Eighth Circuit has rejected in excessive force claims. The Eighth Circuit has held that certain allegations of pain are not sufficient to withstand summary judgment. For example, in *Foster v. Metropolitan Airports Commission*, the court held that the plaintiff's "allegations of pain as a result of being handcuffed, without some evidence of more permanent injury, are [not] sufficient to support his claim of excessive force." 914 F.2d 1076, 1082 (8th Cir. 1990). In *Crumley v. City of St. Paul*, a case cited by defendants, the plaintiff complained that she was "unnecessarily pushed and improperly handcuffed." 324 F.3d 1003, 1007 (8th Cir. 2003). The use of handcuffs, unlike the use of a taser, is a standard practice in nearly every arrest. To allow excessive

force claims to survive summary judgment every time a plaintiff alleged that handcuffs were painful would disregard the inherent necessity of the use of handcuffs in the context of an arrest. Tasers, by contrast, are not a routine part of an arrest and inflict a type of pain different in nature and quality from any injury associated with handcuffing alone. The taser prongs puncture the skin and deliver 50,000 volts of electricity into the body. When properly deployed, a taser incapacitates muscles, causing the suspect to collapse to the ground. Assuming Orsak "must make a showing of some minimum level of injury in order to make out a claim for excessive force, the pain and puncture marks inflicted by the taser are sufficient to do so." *Cook*, 582 F.3d at 860 (Shepherd, J., concurring in part and dissenting in part).

The Court does consider, however, the effects of the taser in assessing whether Officer Wingate violated Orsak's right to be free from excessive force. In assessing the reasonableness of the use of force, the "court may also consider the result of the force" and "the extent of the suspect's injuries." *Smith*, 586 F.3d at ___, 2009 WL 3713701, at *3; *Rohrbough*, 586 F.3d at ___, 2009 WL 3713703, at *2 (internal quotation marks omitted). This analysis is relevant in light of the court's duty to balance the governmental interests at stake, as addressed by the *Graham* factors, against the nature and quality of the intrusion on the individual's Fourth Amendment interests. *See Howard*, 570 F.3d at 989. Where, as here, the governmental interests are minimal, even a comparatively modest intrusion on an individual's Fourth Amendment interests may violate the Constitution.

"Tasers are generally considered non-lethal or less lethal force." *Sanders v. City of Fresno*, 551 F. Supp. 2d 1149, 1168 (E.D. Cal. 2008) (collecting cases). In *Brown*, the Eighth Circuit noted the distinction between a taser used in the less painful "drive stun mode," *see Battiste v. Lamberti*, 571 F. Supp. 2d 1286, 1304 n.12 (S.D. Fla. 2008), as it was against the passenger in *Brown*, and a taser used in the standard mode, as it was against Orsak:

> [T]he Taser causes electrical muscular disruption and . . . a full Taser cycle lasts five seconds and delivers a 50,000 volt shock. The Taser's air cartridge contains two darts that can be deployed and will penetrate the skin, causing electrical muscular disruption between the two darts. . . . [I]f the air cartridge is removed, the Taser may be operated in drive stun mode and used as a pain compliance tool. In drive stun mode, the Taser's electrical probes are applied directly to the person and the electrical muscular disruption occurs between the two probes.

574 F.3d at 495 n.3 (citing the testimony of the officer who deployed the taser). After the taser is fired in the standard mode, the darts remain connected to the taser gun by high-voltage wire. *Oliver ex rel. Estate of Oliver v. Fiorino*, 586 F.3d 898, 903, 2009 WL 3417869, at *2 (11th Cir. 2009). The taser gun then "transmits electrical pulses along the wires and into the body of the target." *Id.* (internal quotation marks omitted). Those electrical pulses occur at a rate of approximately twelve pulses per second, or sixty pulses for each five-second cycle. *Beaver v. City of Fed. Way*, 507 F. Supp. 2d 1137, 1142 (W.D. Wash. 2007). The pulses cause "immobilization, disorientation, loss of balance, and weakness. When used successfully, a taser renders an individual incapacitated, disoriented, and unable to move." *Buckley v. Haddock*, 292 Fed. Appx. 791, 803 (11th Cir. 2008) (Martin, J., dissenting) (citation and internal quotation marks omitted). The taser is "designed to cause significant, uncontrollable muscle contractions capable of

incapacitating even the most focused and aggressive combatants." *Oliver*, 586 F.3d at 903, 2009 WL 3417869, at *2 (internal quotation marks omitted).

The Eighth Circuit has rejected efforts "to minimize the pain of being shot with a stun gun" as "completely baseless," noting that "a stun gun inflicts a painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless." *Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir. 1993). The court described the effects of such force as "torment without marks."[6] *Id.* Other courts have also recognized that the effects of the taser are more than *de minimis*.[7] In *Lewis v. Downey*, the Seventh Circuit rejected a magistrate judge's determination that "the use of the taser gun was a *de minimis* application of force." 581 F.3d at 475; *see also Orem v. Rephann*, 523 F.3d 442, 447-48 (4th Cir. 2008) (affirming the district court's rejection of

---

[6] Orsak's allegation that the taser caused him "excruciating" pain is corroborated by the findings of other courts and the testimony of witnesses in other cases. The Seventh Circuit noted that "one need not have personally endured a taser jolt to know the pain that must accompany it." *Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009); *see also Beaver*, 507 F. Supp. 2d at 1144 ("[I]t is . . . undeniable that being 'tased' is a painful experience."). A state trooper who volunteered to be shot with a taser during taser training described the pain as "unbelievable." *Wilson v. Taser Int'l, Inc.*, 303 Fed. Appx. 708, 710 (11th Cir. 2008). Another plaintiff testified that "being shot with the Taser made him feel like he could not breathe. He testified, 'I'd like to say it felt like a bolt of lightning, but I've never been struck by a bolt of lightning.'" *Parker*, 547 F.3d at 6.

Even the less painful drive stun mode causes significant pain. *See Battiste*, 571 F. Supp. 2d at 1304 n.12 (noting that the drive stun mode "is the least painful and incapacitating of the taser's two settings"). Another plaintiff described the pain from a taser in drive stun mode as "tremendous" and "intense." *Buckley*, 292 Fed. Appx. at 804 (Martin, J., dissenting). The passenger in *Brown* complained of "extreme pain" from the taser, including "sharp pain where the Taser met her arm, with the pain radiating from her upper arm and causing her muscles to clench." 574 F.3d at 495.

[7] *Cook* did not hold that the injury associated with a taser is *de minimis*. Rather, the court balanced the *Graham* factors with the extent of the force used and held that the officer had a "legitimate reason" to deploy the taser. 582 F.3d at 850.

defendant's argument that a 1.5 second application of a taser in drive stun mode resulted in only *de minimis* injury).  In the Fourth Amendment context,[8] the Western District of Washington acknowledged that "the use of a Taser constitute[s] significant force." *Beaver*, 507 F. Supp. 2d at 1144.

Even if a taser does not require hospitalization or cause quantifiable injuries, it does cause extreme pain, and such pain may support a claim for excessive force.  In examining excessive force claims brought under the Eighth Amendment, courts examine the extent of the **pain**, rather than the extent of the injury.  *Hudson v. McMillan*, 503 U.S. 1, 9 (1992).  The Eighth Circuit has noted that "extreme pain can be inflicted with little or no injury." *Hickey*, 12 F.3d at 757.  Just as it would be unacceptable to "permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury," *McMillan*, 503 U.S. at 9, it would also be unacceptable to permit arresting officers to use any degree of force, no matter how painful or intrusive, so long as it did not inflict some arbitrary quantity of injury.  The technology of tasers does not grant law enforcement officials license to cause extreme pain when the governmental interests at stake are minimal.  In such circumstances, the use of a taser inflicts gratuitous pain, in violation of the Fourth Amendment.  *See Buckley*, 292 Fed. Appx. at 802-03 (Martin, J., dissenting) ("[A]t the very least, the Fourth Amendment prohibits the infliction of gratuitous pain and injury as a means to coerce compliance.").

---

[8] In the Eighth Amendment context, courts have recognized that the pain inflicted by a taser can satisfy the objective component of cruel and unusual punishment, which requires a showing of significant harm. *Hickey*, 12 F.3d at 757.

In summary, the Court finds that the evidence establishes a genuine issue of material fact concerning whether the force used against Orsak was objectively reasonable in light of the facts and circumstances confronting Officer Wingate. *See Rohrbough*, 586 F.3d at ___, 2009 WL 3713703, at *2. The nature of Orsak's physical injuries may result in only a minimal damages award, but that question is for a jury to decide. *See Pena v. City of Worthington*, No. 07-1578, 2008 WL 3262420, at *4 (D. Minn. Aug. 7, 2008).

**B. Orsak's Constitutional Right to Be Free from Excessive Force Was Clearly Established at the Time of Officer Wingate's Alleged Conduct.**

Defendants next argue that even if Orsak has presented sufficient evidence to support his excessive force claim, Officer Wingate is entitled to qualified immunity because a reasonable officer would not have known that Officer Wingate's conduct violated Orsak's clearly established constitutional rights.

"Qualified immunity shields a government official from liability when his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Krout*, 583 F.3d at 564 (internal quotation marks omitted). The defense "allows officers to make reasonable errors so that they do not always err on the side of caution for fear of being sued." *Amrine v. Brooks*, 522 F.3d 823, 831 (8th Cir. 2008) (internal quotation marks omitted).

"The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person." *Cook*, 582 F.3d at 849 (internal quotation marks omitted). The dispositive inquiry is whether the state of the law as of September 2006 gave Officer Wingate "fair warning" that his

alleged conduct amounted to excessive force and therefore was unconstitutional. In other words, the Court asks "whether it would be clear to a reasonable officer that [Officer Wingate's] conduct was unlawful in the situation he confronted." *Brown*, 574 F.3d at 499. The court "must make a fact-intensive inquiry . . . in light of the specific context of the case to determine whether Officer [Wingate] is entitled to qualified immunity. There is no requirement that the very action in question has previously been held unlawful, but rather, in the light of pre-existing law the unlawfulness must be apparent." *Rohrbough*, 586 F.3d at ___, 2009 WL 3713703, at *3 (citation and internal quotation marks omitted; first alteration in original).

The Court has examined the specific context of Officer Wingate's use of force against Orsak and concludes that there is a genuine issue of material fact as to whether it would have been clear to a reasonable officer in September 2006 that Officer Wingate's conduct violated Orsak's constitutional right to be free from excessive force. Viewing the facts in the light most favorable to Orsak, as the Court must in assessing this motion, the record shows that Officer Wingate pulled Orsak from his bicycle and threw him to the ground. Then, rather than attempting to handcuff or otherwise restrain Orsak while he was still on the ground, Officer Wingate reached under Orsak's arms, pulled him up to a semi-standing position, released him, and stepped away while ordering Officer Bryant to deploy the taser. According to Orsak's version of events, at no point during that sequence of events did Orsak demonstrate any resistance or make any threats. According to Orsak, at no point during that sequence of events did the officers give Orsak any orders or the opportunity to comply with them. The Court finds that, viewing the facts in the

light most favorable to Orsak, a reasonable officer would be on notice that the use of such force in these circumstances would violate Orsak's clearly established constitutional rights.[9] Where, as here, the *Graham* "considerations all weigh in favor of" the plaintiff, the Eighth Circuit has concluded that it is appropriate to deny summary judgment on a qualified immunity claim. *See Rohrbough*, 586 F.3d at ___, 2009 WL 3713703, at *3; *see also Casey*, 509 F.3d at 1286 ("[A]n officer's violation of the *Graham* reasonableness test is a violation of clearly established law if there are no substantial grounds for a reasonable officer to conclude that there was legitimate justification for acting as she did." (internal quotation marks omitted)).

The Court notes that Officer Wingate's account of the incident differs significantly from the facts as the Court must view them for purposes of summary judgment. "Summary judgment is not appropriate where, as here, a dispute remains regarding facts material to the qualified immunity issue." *Rohrbough*, 586 F.3d at ___, 2009 WL

---

[9] *See, e.g.*, *Brown*, 574 F.3d at 499 (affirming denial of summary judgment on qualified immunity grounds, holding that "the law was sufficiently clear [in October 2005] to inform a reasonable officer that it was unlawful to Taser a nonviolent, suspected misdemeanant who was not fleeing or resisting arrest, who posed little to no threat to anyone's safety, and whose only noncompliance with the officer's commands was to disobey two orders to end her phone call to a 911 operator"); *Samuelson v. City of New Ulm*, 455 F.3d 871, 877 (8th Cir. 2006) (reversing grant of summary judgment on qualified immunity grounds where plaintiff alleged that in January 2003 the defendants "stepped on his head while handcuffing him," and beat, hit and kicked him, even though he was not resisting arrest); *Mayard v. Hopwood*, 105 F.3d 1226, 1227-28 (8th Cir. 1997) (concluding that the use of force was not objectively reasonable where the plaintiff was handcuffed and hobbled in the back seat of a squad car and the defendant slapped her in the face and punched her in the chest); *see also Landis v. Baker*, 297 Fed. Appx. 453, 463 (6th Cir. 2008) ("[T]he officers should have known that the gratuitous or excessive use of a taser would violate a clearly established constitutional right."); *cf. Brown*, 574 F.3d at 499-500 ("[P]risoners have a clearly established right to be free from a Taser shock or its equivalent in the absence of a security threat.").

3713703, at *4.  The Court's ruling does not preclude Officer Wingate from asserting "qualified immunity at trial, where the factual issues will be resolved by a jury." *Id.*

The Court will observe that the deployment of tasers by law enforcement has become widespread.  Tasers obviously can and do serve an important function.  The fact that tasers have become ubiquitous does not mean the device should be used routinely or indiscriminately.  As noted above, tasers cause pain to the victim which is often excruciating and very painful.  Given the constitutional requirement that use of force not be unreasonable, it is critical that the use of tasers be limited to situations in which officer safety is a legitimate concern and other, less painful means of subduing a difficult individual are not available.

When the facts in this case are viewed in a light most favorable to the plaintiff, Officer Wingate's actions in ordering use of the taser fail the test.  Ultimate resolution of this case, however, will depend on a jury's determination of the facts and a jury's assessment of the credibility of the witnesses.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the submissions of the parties, the arguments of counsel, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that defendants' Motion for Summary Judgment [Docket No. 14], is **GRANTED in part** and **DENIED in part** as follows:

1.      Defendants' motion as to plaintiff's excessive force claim against Officer Wingate is **DENIED**.

2.     Defendants' motion as to all other claims is **GRANTED**.  All defendants other than Officer Wingate are **DISMISSED** from this case, and all claims other than plaintiff's excessive force claim are **DISMISSED WITH PREJUDICE**.


DATED:  December 14, 2009                    _____ s/ John R. Tunheim _____
at Minneapolis, Minnesota.                         JOHN R. TUNHEIM
                                                   United States District Judge